**FILED**
**CHARLOTTE, NC**

NOV 1 6 2011

**US DISTRICT COURT**
**WESTERN DISTRICT OF NC**

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **BILL OF INDICTMENT** |
| | ) | |
| v. | ) | DOCKET NO: |
| | ) | |
| KHALED FADEL IBRAHIM (1) | ) | **UNDER SEAL** 3:11CR373 - W |
| a/k/a "Khal," a/k/a "K"; | ) | |
| AHMED SAMY HOSNY KAREEM (2) | ) | |
| a/k/a "Sam," a/k/a "Sammy"; | ) | 18 U.S.C. § 2 |
| KAMAL ZAKI QAZAH (3) | ) | 18 U.S.C. § 21 |
| a/k/a "Keemo"; | ) | 18 U.S.C. § 371 |
| THA'ER ISMAIL AYYAD (4) | ) | 18 U.S.C. § 2314 |
| a/k/a "Old Man," a/k/a "Wild Man"; | ) | 18 U.S.C. § 2315 |
| WAEL MAHMOUD SALEM (5) | ) | 18 U.S.C. § 1956(a)(3) |
| a/k/a "Tony"; | ) | 18 U.S.C. § 1956(h) |
| JOSE CALDERON-SILVER (6); | ) | |
| ZAFER RAMADAN KAFOZI (7) | ) | |
| a/k/a "Uncle Jack"; | ) | |
| HESHAM RAHMAN (8) | ) | |
| a/k/a "Sean"; | ) | |
| ZIAD HASHEM NAJJAR (9) | ) | |
| a/k/a "Z"; | ) | |
| NASSER KAMAL ALQUZA(10); | ) | |
| MURAD AYYAD (11) | ) | |
| a/k/a "Mike" | ) | |

## THE GRAND JURY CHARGES THAT:

# INTRODUCTION

### At All Times Material To This Bill Of Indictment:

1.  Beginning no later than August 12, 2009, and continuing to the present, in Mecklenburg County, in the Western District of North Carolina and elsewhere, KHALED FADEL IBRAHIM, a/k/a "Khal," a/k/a "K" ("IBRAHIM")(1), AHMED SAMY HOSNY KAREEM, a/k/a "Sam," a/k/a "Sammy" ("KAREEM")(2), KAMAL ZAKI QAZAH, a/k/a "Keemo" ("QAZAH")(3), THA'ER ISMAIL AYYAD, a/k/a "Old Man," a/k/a "Wild Man" (THA'ER AYYAD)(4), WAEL MAHMOUD SALEM, a/k/a "Tony" ("SALEM")(5), JOSE CALDERON-SILVER ("CALDERON-SILVER)(6), ZAFER RAMADAN KAFOZI, a/k/a "Uncle Jack" ("KAFOZI")(7), HESHAM RAHMAN, a/k/a "Sean" ("RAHMAN")(8), ZIAD HASHEM NAJJAR, a/k/a "Z" ("NAJJAR")(9), NASSER KAMAL ALQUZA("AL QUZA")(10), and MURAD AYYAD, a/k/a "Mike" (MURAD

AYYAD)(11), defendants and co-conspirators herein, did conspire, confederate and agree with one another and others known and unknown to the grand jury to receive and transport across North and South Carolina state lines over six thousand eight hundred (6,800) master-cases of Marlboro cigarettes they believed to have been stolen and taken by fraud by persons in the States of Virginia and Tennessee, but who unknown to the Defendants, were in fact undercover law enforcement agents and officers (hereinafter "UCs"). The defendants purchased the cigarettes at prices far below their wholesale price and would profit by selling them at retail prices without the payment of state taxes. The defendants paid the UCs over $7.5 million dollars in cash for the purportedly stolen cigarettes with a wholesale value in excess of $15 million and received additional fees for laundering these proceeds through legitimate businesses they owned or controlled.

2.     Marlboro cigarettes are manufactured by PhillipMorrisUSA (PM USA) in Richmond, Virginia. Once produced, the individual cigarettes are packaged into packs of twenty cigarettes each. Ten packs are then added together to make a carton of cigarettes. The cartons are then packaged into cases of 60 cartons each, which are referred to as a "12M or master-case." Once PM USA packages the cigarettes, they are transported by truck to a bonded warehouse where the federal taxes are paid on the cigarettes by PM USA. From the bonded warehouse, the cigarettes are shipped to public warehouses across the United States.

3.     Cigarette wholesalers obtain PM USA cigarettes from public warehouses. Retailers purchase their cigarettes from wholesalers. While most states require that wholesalers place state tax stamps on the cigarette packages and/or cartons they sell, North and South Carolina do not require tax stamps on cigarettes sold in their states.

4.     Between September 2009 and the present, PM USA charged wholesalers an average price of $2,126 ($37.10 per carton) for a master-case of Marlboro cigarettes. As of July 2011, the North Carolina state tax for a pack of cigarettes averaged 45 cents or $4.50 per carton. The average state tax for a pack of cigarettes in South Carolina was 57 cents or $5.70 per carton.

5.     In and around August 2009, federal and state law enforcement authorities learned that IBRAHIM was interested in purchasing cigarettes at prices far below market wholesale value for resale in local stores in and around North and South Carolina. In 2009, the illegal sale of cigarettes was a recognized law enforcement problem because criminal organizations were known to purchase large quantities of cigarettes from low tax states such as North and South Carolina and illegally transport them to higher tax rate states and sell them without paying the sales tax for a considerable profit. Criminal organizations were also known to obtain cigarettes by theft and fraud, including hijacking tractor trailer loads of cigarettes. The stolen cigarettes would then be sold to retailers at a considerable discount and then sold to consumers for huge profits. Wholesalers and retailers who purchased stolen cigarettes would conceal their source by failing to report their purchase of the cigarettes and any required state taxes and stamps.

2

**IBRAHIM's Purchase of Cigarettes Believed to Have Been Stolen in Virginia:**

6.     In August 2009, a UC told IBRAHIM that he could sell him 120 cartons of cigarettes. IBRAHIM offered to pay $1,380 (an average of $11.50 per carton), which price was less than a third of the market price paid by legitimate wholesalers. The UC explained to IBRAHIM that that he acquired the cigarettes by "hitting" trucks—meaning stealing them from trucks—in the State of Virginia. IBRAHIM understood that the cigarettes stolen from trucks in Virginia would be transported across state lines into North Carolina. IBRAHIM told the UC that he would purchase as many cigarettes as the UC could get.

7.     On or about September 9, 2009, the UC sold IBRAHIM six master-cases (360 cartons) of Marlboro cigarettes in Charlotte, North Carolina, for $5,400 in cash, which is less than 40% of the market wholesale price of the cigarettes. The UC told IBRAHIM that the cigarettes he was purchasing were stolen from several trucks in Virginia, but that a new security guard at the Virginia warehouse was making it more difficult to steal the cigarettes.

8.     Between October and December 2009, IBRAHIM requested and purchased more stolen cigarettes in Charlotte, North Carolina—requesting that the UC obtain a mix of different brands of cigarettes. During this time period, IBRAHIM paid the UC over $33,000 in cash for 37 master-cases of cigarettes. On numerous occasions, the UC told IBRAHIM that the cigarettes he was purchasing were stolen from trucks in Virginia.

**KAREEM, QAZAH, and THA'ER AYYAD Assist IBRAHIM In The Purchase Of Purportedly Stolen Cigarettes:**

9.     On or about January 13, 2010, the UC informed IBRAHIM by telephone that he had 21 master-cases of stolen PM USA cigarettes for sale, but did not want to be seen with such a large quantity of stolen cigarettes. IBRAHIM agreed to pay the UC $18,900 in cash and directed the UC to deliver the cigarettes to a Boost Mobile store in Charlotte. On this occasion, IBRAHIM introduced the UC to KAREEM, who assisted in unloading 18 of the 21 master-cases from the UC's truck. IBRAHIM paid the UC $15,000 in cash and requested that the UC return a short time later when another "guy from South Carolina" would be there to pay for the remaining three master-cases. The UC returned to the Boost Mobile store prior to QAZAH's arrival. QAZAH arrived a short time later and met with IBRAHIM away from the UC, but did not introduce him to the UC. IBRAHIM then paid the UC an additional $3,900 in cash. QAZAH was later observed loading an unknown quantity of cigarettes into a van registered in his name. THA'ER AYYAD was observed by the UC at the Boost Mobile store. However, he did not participate in the cigarette sale and was not introduced to the UC.

10.    On or about January 28, 2010, IBRAHIM arranged for the UC to sell him 56 master-cases of cigarettes at a Boost Mobile store in Charlotte, North Carolina, for $50,400 in cash. On

3

this occasion QAZAH, THA'ER AYYAD and KAREEM were also present during the delivery and assisted in loading 37 master-cases into QAZAH's van. Again, QAZAH and THA'ER AYYAD were not introduced to the UC. However, QAZAH's van was later observed driving to a convenience store in Cayce, South Carolina, where the cigarettes were unloaded.

11. On or about February 17, 2010, IBRAHIM purchased 94 master-cases of cigarettes at the Boost Mobile store in Charlotte for $84,600 in cash. The UCs and KAREEM loaded 15 cases into a min-van. During the delivery, one UC said that he was afraid to be driving with a truck filled with "stolen smokes." The remaining 80 master-cases were loaded into a U-Haul truck driven by QAZAH. This truck was observed driving to QAZAH's residence in Columbia, South Carolina. The cigarettes were unloaded by QAZAH and placed in his garage.

12. In March 2010, the UC informed IBRAHIM that he had 30 master-cases of cigarettes for sale in a storage facility in Rock Hill, South Carolina. However, 200 master-cases had been placed in the storage facility by UCs. When IBRAHIM arrived at the storage facility on March 19, 2010, to purchase the 30 master-cases, he observed the other master-cases of PM USA cigarettes and offered to purchase them. The UC refused, stating that they were promised to someone else. IBRAHIM loaded 30 master-cases into his van and paid the UC $27,000 in cash. Shortly after leaving the storage facility, IBRAHIM called the UC to offer him an additional $2 per carton ($120 per master-case) if he would sell them stolen cigarettes to him. On March 22, 2010, IBRAHIM, THA'ER AYYAD and QAZAH purchased 170 master-cases of cigarettes for $172,000 in cash. QAZAH loaded 100 of the cases into his U-Haul truck while IBRAHIM and AYYAD placed the remaining 70 cases into a U-Haul truck they were driving. QAZAH made the statement that he was late to the deal because he had to go to three separate banks to get the money. The UC warned QAZAH to drive carefully so as not to be stopped by the police with so many "stolen smokes." The truck driven by QAZAH was observed driving to a convenience store in Lexington, South Carolina. The truck in which IBRAHIM and THA'ER AYYAD were riding drove to a residence in Charlotte, North Carolina.

### THA'ER AYYAD Introduces SALEM and CALDERON-SILVER:

13. In May 2010, the UC sold 60 master-cases of cigarettes to KAREEM for $54,000 at the Boost Mobile store in Charlotte. THA'ER AYYAD, who was present at the sale, informed the UC that he (THA'ER AYYAD) had the money and that IBRAHIM would no longer be involved in purchasing stolen cigarettes. During a telephone call with the UC to discuss the purchase of 600 master-cases of cigarettes, THA'ER AYYAD introduced SALEM who speaks better English than THA'ER AYYAD. The UC informed both THA'ER AYYAD and SALEM that the cigarettes were stolen from tractor trailers in Virginia and were still wrapped in plastic on pallets. On May 25, 2010, THA'ER AYYAD and SALEM purchased 600 master-cases of purportedly stolen cigarettes for $539,960 in cash. The cigarettes were driven by the UCs in two trucks to a storage facility near Columbia, South

4

Carolina, where they were met by THA'ER AYYAD, SALEM and CALDERON-SILVER. Some of the cigarettes were unloaded at that storage facility, while the remaining cigarettes were taken to a second storage facility in South Carolina. At the second facility, QAZAH loaded 125 master-cases into a U-Haul truck. SALEM and THA'ER AYYAD gave the UCs a bag containing $250,000 in cash and QAZAH provided $285,000 in cash. The remaining $5,000 in cash was delivered by THA'ER AYYAD and SALEM a short while later.

14.  Between June and September 2010, SALEM, CALDERON-SILVER and an unindicted co-conspirator known to the grand jury purchased 1,358 master-cases of purportedly stolen cigarettes on four different occasions in Charlotte, North Carolina and Columbia, South Carolina, for which they paid approximately $1.2 million in cash. During this time, SALEM stated that his intention was to purchase 1,000 master-cases per month for sale in North Carolina, South Carolina and New York.

**SALEM Introduces RAHMAN as his Money Launderer:**

15.  During their transactions with SALEM and THA'ER AYYAD, the UCs expressed concern about how they should handle such a large amount of cash without raising suspicion. SALEM arranged a dinner meeting in Charlotte, North Carolina, to introduce the UCs to his "financial contact." When RAHMAN arrived at the dinner, SALEM introduced him as "my man … he knows my business." SALEM stated that he ran all his money through RAHMAN. RAHMAN explained to the UCs that he was a civil engineer and builds houses as a secondary business where he uses construction accounts to pay contractors in cash. RAHMAN stated that if the UCs gave him cash, he would give them checks that appeared to be drawn on construction accounts, less a fee for his money laundering services. The UCs warned RAHMAN that the cash would come from the sale of cigarettes stolen from Virginia. SALEM and RAHMAN stated that they understood the source of the money was illegal activity. SALEM vouched for RAHMAN, stating that RAHMAN had built three or four houses to clean up his money.

16.  Between October 2010 and August 2011, RAHMAN met with the UCs in Charlotte, North Carolina, on nine different occasions to launder cash. During this period, the UCs gave RAHMAN $250,000 in cash that they represented to be the proceeds of their sale of cigarettes stolen from Virginia and transported in interstate commerce to North and South Carolina. RAHMAN stated that he would keep some of the cash he received from the UCs in his safety deposit box at a bank and deposit the rest into his personal and business accounts. RAHMAN had a business account in the name of Design Construction Services (DCS) at Wachovia Bank in Charlotte, North Carolina. In exchange, RAHMAN gave the UCs six personal checks, twenty business checks, and three third-party checks—altogether totaling $212,500. Some of these checks included notations such as "lumber" or "hardwood floors" that were intended to conceal the nature and source of the cash the UCs gave to RAHMAN. RAHMAN kept $37,500 as his money laundering fee. The following

5

is a summary of the money laundering transactions that RAHMAN conducted in Charlotte, within the Western District of North Carolina:

|     | Date | Amount Laundered | Amount UCs Received | Fee |
| --- | --- | --- | --- | --- |
| a. | 10/13/2010 | $10,000 | $ 8,500 | $ 1,500 |
| b. | 10/27/2010 | $15,000 | $ 12,750 | $ 2,250 |
| c. | 11/19/2010 | $15,000 | $ 12,750 | $ 2,250 |
| d. | 01/09/2011 | $30,000 | $ 25,500 | $ 4,500 |
| e. | 03/01/2011 | $20,000 | $ 17,000 | $ 3,000 |
| f. | 04/14/2011 | $30,000 | $ 25,500 | $ 4,500 |
| g. | 05/13/2011 | $40,000 | $ 34,000 | $ 6,000 |
| h. | 07/8/2011 | $40,000 | $ 34,000 | $ 6,000 |
| i. | 08/10/2011 | $50,000 | $ 42,500 | $ 7,500 |

17. On January 5, 2011, RAHMAN purchased 22 master-cases of purportedly stolen cigarettes in Charlotte, North Carolina, in exchange for a 2008 Honda Accord. RAHMAN then sold the cigarettes to another individual for $23,000. As late as November 8, 2011, RAHMAN solicited from the UCs more money laundering transactions and 200 more master-cases of cigarettes that he believed would be stolen in Virginia.

**SALEM Introduces KAFOZI**:

18. On or about October 14, 2010, the UCs sold 250 master-cases of cigarettes to SALEM and CALDERON-SILVER at a storage facility in Columbia, South Carolina. During this transaction, SALEM introduced KAFOZI to the UCs as his uncle. SALEM and KAFOZI discussed the stolen cigarette business with one of the UCs inside the UC's vehicle while CALDERON-SILVER and the second UC unloaded the cigarettes. SALEM and KAFOZI gave the UC a *Nautica* bag with $250,000 cash inside. KAFOZI asked the UC if he could deliver cigarettes to Atlanta, Georgia.

19. On or about November 2, 2010, SALEM and KAFOZI purchased 330 master-cases of cigarettes at a storage facility in Columbia, South Carolina. During this sale, SALEM and KAFOZI met with a UC to discuss their business. SALEM said they wanted 300 to 400 cases per month delivered to Columbia, South Carolina and another 300 cases delivered to Greensboro, North Carolina. SALEM was concerned that selling too many stolen cigarettes in one place would be noticed by PM USA representatives who visit the stores where their product is sold. KAFOZI suggested that the UC's should get forged invoices for the cigarettes in case they are stopped.

20. In December 2010, the UCs delivered 330 master-cases to QAZAH and THA'ER AYYAD in Columbia, South Carolina. The UCs had arranged to sell the cigarettes to KAFOZI, but were contacted by QAZAH and THA'ER AYYAD who explained that they had the money

6

and would not give it to KAFOZI. QAZAH and THA'ER AYYAD gave the UCs $349,900 in a black suitcase in the parking lot of the Carolina Place Mall in North Carolina, in exchange for a key to the storage facility in South Carolina.

**THA'ER AYYAD Introduces NAJJAR and MURAD AYYAD**:

21.    On or about January 4, 2011, the UCs had a dinner meeting in Charlotte, North Carolina, with THA'ER AYYAD and a person he introduced as NAJJAR. NAJJAR had previously spoken with a UC during a telephone call with THA'ER AYYAD. NAJJAR had asked the UC if he could get 1,000 cases of cigarettes. The UC replied that the cigarettes were stolen, not purchased. NAJJAR responded that they (the UCs and conspirators) needed to keep a low profile. NAJJAR said: "If this thing goes down, we all go down;" meaning that if one person were arrested, all would be arrested. During the dinner meeting, NAJJAR explained to the UCs how he purchased cars in the United States and ships them overseas as a way to launder money.

22.    Between January 27 and April 19, 2011, THA'ER AYYAD and NAJJAR purchased over 1500 master-cases of purportedly stolen cigarettes from the UCs in four separate transactions in Durham, Greensboro and Charlotte, North Carolina. They paid a total of approximately $1.8 million in cash for the stolen cigarettes.

23.    On or about August 19, 2011, a UC met with THA'ER AYYAD to discuss resuming his purchase of stolen cigarettes from the UCs. The UCs had stopped selling stolen cigarettes to THA'ER AYYAD because QAZAH said that he was the source of the money used by AYYAD and his coconspirators to purchase stolen cigarettes from the UCs. AYYAD wanted to do business directly with the UCs again and introduced MURAD AYYAD as a cousin with whom he would be working to "move" stolen cigarettes in the future. On this occasion, a UC warned MURAD AYYAD that the cigarettes he would be purchasing were stolen.

24.    In and around August, 2011, MURAD AYYAD brokered the purchase of 274 master-cases of stolen cigarettes from the UCs for $354,200 in cash. On or about August 25, 2011, the UCs placed the 274 master-cases of purportedly stolen cigarettes in a public storage unit in Charlotte, North Carolina. On that date, THA'ER and MURAD AYYAD met a UC in a shopping mall parking lot in Charlotte, North Carolina where they gave him $354,200 in cash in exchange for a key to the public storage unit holding the stolen cigarettes. After this meeting, two associates of THA'ER AYYAD were observed at the public storage unit loading the cigarettes into a Budget rental truck which they then drove into South Carolina. In South Carolina, the rental truck met a vehicle occupied by THA'ER and MURAD AYYAD. The two vehicles then drove to a public storage facility in Columbia, South Carolina. During the sale of these purportedly stolen cigarettes, MURAD AYYAD informed the UC that the market was hungry and they (the conspirators) did not want to stop buying stolen cigarettes. A UC advised THA'ER and MURAD AYYAD that the cigarettes they were purchasing had been stolen in Tennessee.

7

**QAZAH Introduces ALQUZA**:

25.  In April 2011, the UCs and QAZAH discussed how the UCs could launder the large amount of cash they were receiving for their stolen cigarettes. QAZAH offered to introduce the UCs to his uncle (ALQUZA) who owned several businesses and could launder $100,000 dollars per month for ten months—a total of $1 million. QAZAH explained that the UCs would give cash to his uncle (ALQUZA) who would then give the UCs checks from five different stores. The uncle (ALQUZA) would charge 6% as his laundering fee. In addition, QAZAH offered to launder $50,000 per month using his car lot and two gas stations.

26.  On or about May 10, 2011, the UCs met with QAZAH and ALQUZA in Columbia, South Carolina, to discuss using ALQUZA's money laundering services. The UCs explained to ALQUZA that the source of their cash was the illegal interstate transportation and sale of stolen cigarettes. ALQUZA replied that he had provided similar services to others in the past.

27.  On June 22, 2011, a UC met ALQUZA in Columbia, South Carolina and gave him $50,000 in cash. ALQUZA gave the UC five checks in amounts less than $10,000 each for a total of $47,000. ALQUZA kept $3,000 for his money laundering fee.

28.  On July 29, 2011, a UC met with QAZAH in Charlotte, North Carolina and gave him $25,000 in cash. In return QAZAH gave the UC a check in the amount of $23,500 drawn on his business 7 Star Auto Sales, with the notation "Car BMW." In addition, QAZAH gave the UC two checks signed by ALQUZA in amounts less than $10,000 to replace two of the five checks ALQUZA had previously given the UC. ALQUZA had been advised that two of the original five checks were not accepted by the bank in which the UC attempted to deposit it.

29.  In June 2011, QAZAH alone made two purchases of stolen cigarettes: 410 cases in Columbia, South Carolina for $553,580 and 221 cases in Charlotte, North Carolina for $272,075.

30.  On or about August 24, 2011, the UCs met with ALQUZA in Columbia, South Carolina and gave him $75,000 in cash. ALQUZA gave the UCs four checks drawn on his personal bank accounts at Wachovia and First Federal Savings and Loan Association of Charleston ("First Federal") totaling $70,500. ALQUZA kept $4,500 as his money laundering fee. ALQUZA stated that he would draft a contract for the UCs to sign next time they met. The contract would falsely state that the UCs were contractors performing work for ALQUZA's stores. ALQUZA also advised the UCs to create a limited liability corporation (LLC) in order to open a business account in which they could deposit the checks they received from ALQUZA.

8

31.  On or about September 15, 2011, UCs sold 810 master-cases of cigarettes to QAZAH at a warehouse owned by ALQUZA in Columbia, South Carolina.  QAZAH paid the UCs $1,093,500 for the cigarettes.  ALQUZA was present during the sale and discussed money laundering with a UC.  ALQUZA also assisted in unloading cigarettes from the trucks.

32.  On or about October 20, 2011, the UCs met with QAZAH and ALQUZA in Columbia, South Carolina where they gave them $125,000 in cash.  In return the UCs received two checks from QAZAH and six checks from ALQUZA totaling $117,500.  QAZAH kept $3,000 and ALQUZA kept $4,500 for their money laundering fees.

## COUNT ONE

**Violation:** 18 U.S.C. § 371 (Conspiracy)

33.  Paragraphs 1 through 32 of the Introduction to this Bill of Indictment are hereby realleged and incorporated into Count One by reference herein.

34.  From on or about August 12, 2009, through the present, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendants

> **IBRAHIM (1),**
> **KAREEM (2),**
> **QAZAH (3),**
> **THA'ER AYYAD (4),**
> **SALEM (5),**
> **CALDERON-SILVER (6),**
> **KAFOZI (7),**
> **RAHMAN (8),**
> **NAJJAR (9),**
> **ALQUZA(10), and**
> **MURAD AYYAD (11)**

did knowingly and willfully combine, conspire, confederate and agree with each other, and others both known and unknown to the Grand Jury, to commit offenses against the United States, including violations of Title 18 United States Code, Sections 2314 (interstate transportation of stolen goods (ITSP) and 2315 (receiving property stolen in interstate commerce).

## MANNER AND MEANS

35.  The Defendants and others, carried out the conspiracy in the manner and means described in Introductory paragraphs 1 through 32 of this Bill of Indictment, among others.

9

## OVERT ACTS

36. In furtherance of the conspiracy, at least one of the defendants herein did commit or cause the commission of at least one of the overt acts described in Introductory paragraphs 1 through 32 of this Bill of Indictment.

37. On or about the dates listed below, at or near the location described for each overt act below, the defendants named therein did receive the number of master-cases (M/C) of cigarettes with the estimated wholesale value indicated for that overt act, which cigarettes the named defendants believed were stolen in Virginia or Tennessee and transported in interstate commerce to the location described for each overt act and the named defendants paid the amount indicated in United States currency to the UCs without paying the state taxes due on such sales:

|    | Date | Defendants | Location | No. M/C | Wholesale Value | Amount Defendants Paid |
|----|------|-----------|----------|---------|-----------------|------------------------|
| a. | 9/9/09 | IBRAHIM | Charlotte, NC | 6 | $12,830 | $5,400 |
| b. | 10/14/09 | IBRAHIM | Charlotte, NC | 10 | $21,384 | $9,000 |
| c. | 11/5/09 | IBRAHIM | Charlotte, NC | 12 | $26,092 | $10,800 |
| d. | 12/10/09 | IBRAHIM | Charlotte, NC | 15 | $32,616 | $13,500 |
| e. | 1/13/10 | IBRAHIM, KAREEM & QAZAH | Charlotte, NC | 21 | $45,662 | $18,900 |
| f. | 1/28/10 | IBRAHIM, KAREEM, QAZAH & THA'ER AYYAD | Charlotte, NC | 56 | $121,766 | $50,400 |
| g. | 2/17/10 | IBRAHIM, KAREEM & QAZAH | Charlotte, NC | 94 | $204,393 | $84,600 |
| h. | 3/19/10 | IBRAHIM | Rock Hill, SC | 30 | $65,232 | $27,000 |
| i. | 3/22/10 | IBRAHIM, QAZAH, & THA'ER AYYAD | Rock Hill, SC | 170 | $369,648 | $172,400 |

10

| | Date | Defendants | Location | No. M/C | Wholesale Value | Amount Defendants Paid |
|---|---|---|---|---|---|---|
| j. | 4/21/10 | IBRAHIM, QAZAH, & THA'ER AYYAD | Rock Hill, SC | 250 | $543,600 | $226,000 |
| k. | 5/6/10 | KAREEM & THA'ER AYYAD | Charlotte, NC | 60 | $130,464 | $54,000 |
| l. | 5/25/10 | QAZAH, THA'ER AYYAD & SALEM | Columbia, SC | 600 | $1,333,440 | $539,960 |
| m | 6/24/10 | QAZAH, THA'ER AYYAD & SALEM | Charlotte NC | 500 | $1,111,200 | $448,010 |
| n. | 7/1/10 | SALEM & CALDERON-SILVER | Charlotte, NC | 300 | $666,720 | $271,020 |
| o. | 7/29/10 | SALEM, QAZAH & CALDERON-SILVER | Columbia, SC | 300 | $666,720 | $271,010 |
| p. | 9/9/10 | SALEM & CALDERON-SILVER | Columbia, SC | 258 | $573,379 | $236,080 |
| q. | 10/14/10 | SALEM, CALDERON-SILVER & KAFOZI | Columbia, SC | 250 | $555,600 | $250,000 |
| r. | 11/2/10 | SALEM & KAFOZI | Columbia, SC | 330 | $733,392 | $330,000 |
| s. | 12/2/10 | QAZAH &THA'ER AYYAD | Columbia, SC | 350 | $777,840 | $349,900 |
| t. | 1/27/11 | THA'ER AYYAD & NAJJAR | Durham, NC | 378 | $858,211 | $452,920 |
| u. | 2/24/11 | THA'ER AYYAD & NAJJAR | Greensboro, NC | 540 | $1,226,016 | $648,020 |

11

| | Date | Defendants | Location | No. M/C | Wholesale Value | Amount Defendants Paid |
|---|---|---|---|---|---|---|
| v. | 3/22/11 | THA'ER AYYAD & NAJJAR | Greensboro, NC | 292 | $662,956 | $359,900 |
| w. | 4/19/11 | THA'ER AYYAD & NAJJAR | Charlotte, NC | 351 | $796,910 | $413,600 |
| x. | 6/9/11 | QAZAH | Columbia, SC | 410 | $930,864 | $553,580 |
| y. | 6/23/11 | QAZAH | Charlotte, NC | 221 | $501,758 | $272,075 |
| z. | 8/25/11 | THA'ER AYYAD & MURAD AYYAD | Charlotte, NC | 274 | $636,885 | $354,200 |
| aa | 9/15/11 | QAZAH & ALQUZA | Columbia, SC | 810 | $1,882,764 | $1,093,500 |

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO through THIRTEEN

**Violation:** 18 U.S.C. §§ 2, 2315 & 21
(Receiving Stolen Property)

38. Paragraphs 1 through 32 of the Introduction to this Bill of Indictment and Count One are hereby realleged and incorporated into Counts Two through Thirteen by reference herein.

39. On or about the dates listed below for each of Counts Two through Thirteen, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendants named therein, aided and abetted by each other and others known and unknown to the grand jury, did receive, possess, conceal, store barter, sell and dispose of certain goods they then believed to have been stolen based on the representations of UCs, that is PM USA cigarettes of a value of $5,000 or more, which goods they believed had crossed a State boundary after having been represented as stolen in Virginia or Tennessee on a date preceding the date alleged in each of Counts Two through Thirteen and subsequently brought into the State of North Carolina, believing the same to have been stolen in the State of Virginia.

12

| COUNTS | Date Received | Defendant(s) | No. M/C | Warehouse Value |
|--------|--------|--------|--------|--------|
| TWO | 9/9/09 | IBRAHIM (1) | 6 | $12,830 |
| THREE | 10/14/09 | IBRAHIM (1) | 10 | $21,384 |
| FOUR | 11/5/09 | IBRAHIM (1) | 12 | $26,092 |
| FIVE | 12/10/09 | IBRAHIM (1) | 15 | $32,616 |
| SIX | 1/13/10 | IBRAHIM (1), KAREEM (2) & QAZAH (3) | 21 | $45,662 |
| SEVEN | 1/28/10 | IBRAHIM (1), KAREEM (2), QAZAH (3) & THA'ER AYYAD (4) | 56 | $121,766 |
| EIGHT | 2/17/10 | IBRAHIM (1), KAREEM (2) & QAZAH (3) | 94 | $204,393 |
| NINE | 5/6/10 | KAREEM (2) & THA'ER AYYAD (4) | 60 | $130,464 |
| TEN | 6/24/10 | QAZAH (3), THA'ER AYYAD (4) & SALEM (5) | 500 | $1,111,200 |
| ELEVEN | 4/19/11 | THA'ER AYYAD (4) & NAJJAR (9) | 351 | $796,910 |
| TWELVE | 6/23/11 | QAZAH (3) | 221 | $501,758 |
| THIRTEEN | 8/25/11 | THA'ER AYYAD (4) & MURAD AYYAD (11) | 274 | $636,885 |

All in violation of Title 18, United States Code, Sections 2315, 2 and 21.

## COUNTS FOURTEEN through SEVENTEEN

**Violation:** 18 U.S.C. §§ 2, 2314 & 21
(ITSP)

40. Paragraphs 1 through 32 of the Introduction to this Bill of Indictment and Count One are hereby realleged and incorporated into Counts Fourteen through Seventeen by reference herein.

41. On or about the dates listed below for each of Counts Fourteen through Seventeen, in the Western District of North Carolina and elsewhere, the defendants named therein, aided and abetted by each other and others known and unknown to the grand jury, did unlawfully

13

transport in interstate commerce from Charlotte, North Carolina, to the cites in South Carolina, listed in each of Counts Fourteen through Seventeen, goods they then believed to have been stolen based on the representations of the UCs, that is PM USA cigarettes of a value of $5,000 or more:

| COUNTS | Date Received | Defendant(s) | Transported To: | No. M/C | Warehouse Value |
|---|---|---|---|---|---|
| FOURTEEN | 1/28/10 | IBRAHIM (1), KAREEM (2), QAZAH (3) & THA'ER AYYAD (4) | Cayce, SC | 56 | $121,766 |
| FIFTEEN | 6/24/10 | QAZAH (3) THA'ER AYYAD (4) &, SALEM (5) | Columbia, SC | 500 | $1,111,200 |
| SIXTEEN | 4/19/11 | THA'ER AYYAD (4) & NAJJAR (9) | Columbia, SC | 351 | $796,910 |
| SEVENTEEN | 8/25/11 | THA'ER AYYAD (4) & MURAD AYYAD (11) | Columbia, SC | 274 | $636,885 |

All in violation of Title 18, United States Code, Sections 2314, 2 and 21.

## COUNT EIGHTEEN

**Violation:** 18 U.S.C. § 1956(h)
(Money Laundering Conspiracy)

42. Paragraphs 1 through 32 of the Introduction to this Bill of Indictment and Count One are hereby realleged and incorporated into Count Eighteen by reference herein.

43. Beginning on or about September 2, 2010, and continuing through the present in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**SALEM (5),**
**RAHMAN (8)**

and persons known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree with each other knowing that property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct

14

and attempt to conduct such financial transactions with the intent to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity in violation of 18 U.S.C. § 1956.

## MANNER AND MEANS OF THE CONSPIRACY

44.    Members of the conspiracy paid UCs for purportedly stolen cigarettes to promote their criminal conduct;

45.    Members of the conspiracy created fictitious businesses and business operations to conceal their criminal conduct;

46.    Members of the conspiracy used legitimate businesses and business accounts to conduct financial transaction in an effort to conceal their criminal conduct;

47.    Members of the conspiracy used personal banking accounts to conduct financial transaction in an effort to conceal their criminal conduct;

48.    A member of the conspiracy received a vehicle as payment for purportedly stolen cigarettes to conceal their criminal conduct;

49.    Members of the conspiracy engaged in financial transactions as detailed in Introductory Paragraphs 1 through 32 of this Bill of Indictment, which are incorporated by reference as though set forth in full.

All in violation of Title 18, United States Code, Section 1956(h).

# COUNT NINETEEN

**Violation:** 18 U.S.C. § 1956(h)
(Money Laundering Conspiracy)

50.    Paragraphs 1 through 32 of the Introduction to this Bill of Indictment and Count One are hereby realleged and incorporated into Count Nineteen by reference herein.

51.    Beginning on or about May 10, 2010, and continuing through the present in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**QAZAH (3),**
**ALQUZA(10)**

and persons known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree with each other:

15

(a)   knowing that property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct and attempt to conduct such financial transactions with the intent to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity in violation of 18 U.S.C. § 1956, and

(b)   knowingly engage and attempt to engage in monetary transactions by, through and to financial institutions, affecting interstate or foreign commerce, in property they believed to have been criminally derived of a value greater than $10,000, such property having been represented as being derived from a specified unlawful activity in violation of 18 U.S.C. § 1957.

## MANNER AND MEANS OF THE CONSPIRACY

52. Members of the conspiracy paid UCs for purportedly stolen cigarettes to promote their criminal conduct;

53. Members of the conspiracy created fictitious businesses and business operations to conceal their criminal conduct;

54. Members of the conspiracy used legitimate businesses and business accounts to conduct financial transaction in an effort to conceal their criminal conduct;

55. Members of the conspiracy used personal banking accounts to conduct financial transaction in an effort to conceal their criminal conduct;

56. Members of the conspiracy leased vehicles to facilitate the transportation of purportedly stolen cigarettes and thereby promote their criminal conduct

57. Members of the conspiracy engaged in financial transactions as detailed in Introductory Paragraphs 1 through 32 of this Bill of Indictment, which are incorporated by reference as though set forth in full.

58. On or about the dates listed below, the named defendants and members of the conspiracy knowingly engaged and attempted to engage in the following monetary transactions by, through or to a financial institution, affecting interstate commerce, in property of a value greater than $10,000 that they then believed to have been criminally derived from specified unlawful activities, to wit: checks drawn on bank accounts in exchange for cash they believed to be derived from their receipt, possession, sale and interstate transportation of PM USA cigarettes purportedly stolen and transported in interstate commerce:

16

|   | Defendant | Check Date | Account Name | Financial Institution | Check No. | Amount |
|---|-----------|-----------|--------------|----------------------|-----------|--------|
| a. | QAZAH | 7/29/11 | 7 Stars Auto Sales | First Citizens | 1637 | $23,500 |
| b. | ALQUZA | 8/29/11 | Nasser Alquza | Wachovia | 2530 | $19,800 |
| c. | ALQUZA | 9/5/11 | Nasser Alquza | Wachovia | 2531 | $18,400 |
| d. | ALQUZA | 9/10/11 | Nasser Alquza | First Federal | 1366 | $17,300 |
| e. | ALQUZA | 9/15/11 | Nasser Alquza | First Federal | 1367 | $15,000 |

All in violation of Title 18, United States Code, Section 1956 (h).

## COUNTS TWENTY—THIRTY

**Violation:** 18 U.S.C. §§ 1956(a)(3) and 2 (Money Laundering and Aiding and Abetting).

59. Paragraphs 1 through 32 of the Introduction and the paragraphs of Counts One through Nineteen of this Bill of Indictment are realleged and incorporated into Counts Twenty through Thirty by reference herein.

60. On or about the dates set forth below in each of Counts Twenty through Thirty, in Mecklenburg County, North Carolina, within the Western District of North Carolina and elsewhere, the defendants named therein, aided and abetted by others known and unknown to the grand jury, did knowingly conduct and attempt to conduct the financial transactions affecting interstate commerce described in each of Counts Twenty through Thirty.

61. In each of Counts Twenty through Thirty, the transactions involved property represented by a UC to be the proceeds of specified unlawful activity in whole or in part.

62. With respect to each of the financial transactions listed in Counts Twenty through Thirty, the defendants named therein intended to promote the carrying on of a specified unlawful activity, to wit: the receipt, possession and transportation of purportedly stolen cigarettes that had been represented to have been transported in interstate commerce (hereinafter "stolen cigarettes"); and to conceal the nature, location, source, ownership and control of the proceeds of said specified unlawful activity:

17

| COUNTS | DEFENDANT | DATE | FINANCIAL TRANSACTION: |
|--------|-----------|------|------------------------|
| TWENTY | RAHMAN (8) | 10/13/2010 | RAHMAN provided the UC with a check drawn on the Wachovia bank account of DCS in the amount of $8,500 in exchange for $10,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-ONE | RAHMAN (8) | 10/27/2010 | RAHMAN provided the UC with two checks: one drawn on the Wachovia bank account of DCS and second drawn on his personal Wachovia account, in the total amount of $12,750, in exchange for $15,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-TWO | RAHMAN (8) | 11/19/2010 | RAHMAN provided the UC with two checks: one drawn on the Wachovia bank account of DCS and second drawn on his personal Wachovia account, in the total amount of $12,750, in exchange for $15,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-THREE | RAHMAN (8) | 1/9/2011 | RAHMAN provided the UC with six checks with false notations as to their purpose: two drawn on the Wachovia bank account of DCS and four drawn on his personal Wachovia account, in the total amount of $25,500, in exchange for $30,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-FOUR | RAHMAN (8) | 3/1/2011 | RAHMAN provided the UC with three checks payable to himself from third-parties in the total amount of $17,000, which checks he endorsed over to the UC in exchange for $20,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |

18

| COUNTS | DEFENDANT | DATE | FINANCIAL TRANSACTION: |
|---|---|---|---|
| TWENTY-FIVE | RAHMAN (8) | 4/14/2011 | RAHMAN provided the UC with four checks with false notations as to their purpose: drawn on the Wachovia bank account of DCS, in the total amount of $25,500; in exchange for $30,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-SIX | RAHMAN (8) | 5/13/2011 | RAHMAN provided the UC with three checks with false notations as to their purpose: drawn on the Wachovia bank account of DCS, in the total amount of $34,000; in exchange for $40,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-SEVEN | RAHMAN (8) | 7/8/2011 | RAHMAN provided the UC with four checks with false notations as to their purpose: drawn on the Wachovia bank account of DCS, in the total amount of $34,000; in exchange for $40,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-EIGHT | QAZAH (3) | 7/29/2011 | QAZAH provided the UC with a check, with a false notation as to its purpose, drawn on the Wachovia Bank account of 7-Star Auto Sales in the amount of $23,500; in exchange for $25,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |
| TWENTY-NINE | QAZAH (3) & ALQUZA (10) | 7/29/2011 | QAZAH provided the UC with two personal checks drawn on ALQUZA's Wachovia account in the total amount of $18,900; which checks were to replace two Wachovia checks provided to the UCs by ALQUZA on or about June 22, 2011, in exchange for cash represented to be the proceeds of the sale of stolen cigarettes, but were not accepted by the bank because they were "starter" checks. |

19

| COUNTS | DEFENDANT | DATE | FINANCIAL TRANSACTION: |
|--------|-----------|------|------------------------|
| **THIRTY** | **RAHMAN (8)** | 8/10/2011 | RAHMAN provided the UC with seven checks with false notations as to their purpose: three drawn on the Wachovia bank account of DCS and four drawn on his personal Wachovia account, in the total amount of $42,500, in exchange for $50,000 in cash represented to be the proceeds of the sale of stolen cigarettes. |

All in violation of Title 18, United States Code, Sections 1956 (a)(3) and 2.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

63.  Notice is hereby given of the provisions of 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c). Under section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by section 981(a)(1)(C). The defendants have or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with sections 981, 982, 853, and/or 2461(c):

   a.  all property which constitutes or is derived from proceeds traceable to the violations alleged in this Bill of Indictment;

   b.  all property involved in the violations alleged in this Bill of Indictment;

   c.  all property used or intended to be used to commit the violations alleged in this Bill of Indictment;

   d.  in the event that any property described in (a), (b), or (c) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendants, to the extent of the value of the property described in (a), (b), and (c).

64.  The Grand Jury finds probable cause to believe that the following properties are subject to forfeiture on one or more of the grounds stated above:

20

a.  all currency and monetary instruments constituting or derived from proceeds traceable to the offenses alleged in this Bill of Indictment, including but not limited to the sum of approximately $15 million as a forfeiture money judgment;

b.  all funds received and on deposit in the following financial accounts:

   (1)  Bank of America xxxx-xxxx-4596 (SALEM);
   (2)  Bank of America xxxx-xxxx-9051 (SALEM);
   (3)  First Citizens xxxxxxxx6909 (QAZAH);
   (4)  First Citizens xxxxxxxx7601 (Seven Stars LLC) (QAZAH);
   (5)  Wells Fargo xxxxxxxxx2102 (QAZAH);
   (6)  First Federal xxxx2606 (ALQUZA);
   (7)  First Federal xxxxxx8483 (Rania Inc. dba Subway 22320) (ALQUZA);
   (8)  First Federal xxxxxx8491 (Samir Inc. dba Subway 11684) (ALQUZA);
   (9)  First Federal xxxxxx1782 (Dina Inc. dba Subway 22598) (ALQUZA);
   (10) First Federal xxxxxx8587 (ALQUZA and May Hassouneh) (ALQUZA);
   (11) First Federal xxxxxx9591 (May Hassouneh) (ALQUZA);;
   (12) First Federal xxxxxx5762 (ALQUZA and May Hassouneh) (ALQUZA);
   (13) First Federal xxxx4886 (Ali Qaza LLC) (ALQUZA);;
   (14) First Federal xxxx2606 (ALQUZA and Waleed Alquza);
   (15) Wells Fargo xxxxxxxxx2464 (ALQUZA);
   (16) First Federal xxxxx9591 (May Hassouneh) (ALQUZA);
   (17) Bank of Bluegrass x5513 (ALQUZA);
   (18) Wells Fargo xxxxxxxxx8571 (RAHMAN);
   (19) Wells Fargo xxxxxxxxx3745 (RAHMAN);
   (20) Wells Fargo xxxxxxxxx5542 (Design Construction Service) (RAHMAN);
   (21) Wells Fargo xxxxxxxxx4170 (Design Construction Service) (RAHMAN);
   (22) First Clearing xxxx8250 (RAHMAN);
   (23) Wells Fargo xxxxxxxxx7085 (RAHMAN) and
   (24) ETrade xxxx-0874 (RAHMAN).

c.  all assets, inventory and property owned or held by the following business entities:

   (1) Seven Stars LLC (QAZAH);
   (2) Rania Inc. Subway, 528 Belle Station Blvd., Mt. Pleasant, SC, (ALQUZA);
   (3) Dina Inc. Subway, 3365 Morgans Pt. Rd.,  Mt. Pleasant, SC, (ALQUZA);
   (4) Subway No. 39815, 1310 N. Fraser St., Georgetown, SC, (ALQUZA);
   (5) Subway No. 39816, 4920 Centre Pointe Dr., Charleston SC, (ALQUZA);
   (6) Ali Qaza LLC Subway, 528 Longpoint Rd., Mt. Pleasant, SC, (ALQUZA);
   (7) Samir Inc. Subway, 1400 Palm Blvd., Isle of Palms, SC, (ALQUZA); and
   (8) Subway, 7400 Rivers Ave., Charleston, SC, (ALQUZA).

d.    the following real property:

(1)    21 Farrier Court, Columbia, SC (QAZAH);
(2)    1716 Budon Ct., Columbia, SC (QAZAH);
(3)    6132 N. Main St., Columbia, SC (City Food Mart of Columbia, LLC);
(4)    4016 Trotter Road, Columbia, SC (QAZAH);
(5)    1609 Oakhurst Dr., Mt. Pleasant, SC (ALQUZA);
(6)    1029 Kiawah Dr., Lexington, KY (ALQUZA);
(7)    4452 Turtle Creek Way, Lexington, KY (ALQUZA);
(8)    337 Whitfield Dr., Lexington, KY (ALQUZA);
(9)    1479 Boardwalk, Lexington, KY (ALQUZA);
(10)   3724 Covenant, Columbia, SC (Kamal, LLC) (ALQUZA); and
(11)   1837 Parsons Street, Charlotte, NC (RAHMAN).

e.    other property as follows:

(1)    One note secured by a deed of trust on 1712 Russell Ave., Charlotte, NC
       (IBRAHIM) and
(2)    One note secured by a deed of trust 3514 Rogers St., Charlotte, NC
       (IBRAHIM).

A TRUE BILL:

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

MICHAEL E. SAVAGE
WILLIAM BRAFFORD
ASSISTANT UNITED STATES ATTORNEYS

22

*Revised AO 45 (WDNC-03/07)*

## NEW CRIMINAL CASE COVER SHEET

### U. S. DISTRICT COURT

*(To be used for **all** new Bills of Indictments and Bills of Information)*

**CASE SEALED:**    ( ) Yes      (x) No      **DOCKET NUMBER:** _____

*(If case is to be sealed, a Motion to Seal and proposed Order **must** be attached.)*

**CASE NAME**      :      United States v. Khaled Ibrahim, et al

**COUNTY OF OFFENSE**    :      **Mecklenburg**

**RELATED CASE INFORMATION**      :

     *Magistrate Judge Case Number*      :      _____

     *Search Warrant Case Number*      :      _____

     *Miscellaneous Case Number*      :      _____

     *Rule 20b*      :      _____

**SERVICE OF PROCESS -**    ***Warrant*** _____

**U.S.C. CITATIONS** *(Mark offense carrying greatest weight)*:    ☐ Petty      ☐ Misdemeanor      [x] Felony

**JUVENILE**   :      ☐ Yes      **[x] No**

**ASSISTANT U. S. ATTORNEY** :      Mike Savage _____

**VICTIM / WITNESS COORDINATORS** :   Shirley.Rutledge@usdoj.gov

**INTERPRETER NEEDED**      :      _____

**LIST LANGUAGE AND/OR DIALECT:**      _____

**REMARKS AND SPECIAL INSTRUCTIONS:** _____